Jasen, J.
(dissenting). The order of the Appellate Division should be reversed and a new trial ordered.
At the time of the accident, plaintiff John Amaro, 38 years old, was a New York City fireman of 13 years’ experience. On February 4, 1967, he was stationed at a firehouse in Brooklyn and was assigned to a night tour of duty, 6:00 p.m. to 9:00 a.m., the following morning. At noon of that day, he consumed, for his lunch, some sandwiches and a glass of wine. After playing football in Prospect Park for some time, he reported for work. At roll call, his appearance was checked and he was marked fit for duty. After lineup, he, along with the other firemen, assembled in the kitchen to prepare their evening meal, a meal which would not be eaten until completion of a drill scheduled for 7:30 p.m. At 7:15 p.m., Amaro climbed a set of stairs to the second floor and entered a lavatory located on that floor of the firehouse. Lieutenant *38 Steyert, the officer in charge of the station, was also upstairs, in his office in another portion of the second floor. Shortly before 7:30 p.m., Steyert noted that the lights on the second floor were lit at the time he descended the stairs. When Steyert assembled the firemen for the scheduled drill, he noticed that Amaro was not present. He walked to the stairway and shouted, "Drill time, John, come on down.” Amaro responded, "Be right down, Lou”, and emerged into a room that he claimed was totally dark. The only light he could see was a "faint glow” from a light on Steyert’s desk. When he left the lavatory, he headed for the stairway. As he reached the middle of the room, the fire alarm sounded. Instead of proceeding to the stairway, he elected to use a sliding pole located on the opposite side of the room. He changed directions and began to run. He ran towards the pole in total darkness with his arms outstretched. The pole was in a recessed cabinet situated between two bunk beds. Although designed to have two protective half doors, one door was missing and the other was permanently pushed in. The plaintiff ran into either the door or the pole and fell through the hole to the floor below. As a result of the fall, plaintiff sustained severe injuries.
Plaintiff commenced a tort action against the City of New York, alleging that the city was negligent in not maintaining proper lighting around the pole area and in not protecting the pole enclosure with operable doors. In its defense, the city maintained that the plaintiff was guilty of contributory negligence. At the trial, a fire department medical officer testified that when he visited plaintiff at a hospital on the night of the accident, he detected "an odor of alcohol” on Amaro’s breath. Upon objection, the jury was directed by the court to disregard this testimony, the court ruling that this observation was too remote from the time of the injury. The medical officer continued to testify, stating that he directed that the plaintiff’s blood be tested. A sample was taken and sent to a private medical laboratory. Since the accident occurred on a Friday night, the test was not conducted until Monday. The analysis revealed the presence of .09% alcohol in the plaintiff’s bloodstream, an amount that is abnormally high. The court excluded the test results from the jury’s consideration on the ground that the medical officer could not name the driver who took the sample from hospital to laboratory and, thus, a chain of custody was not established. The man believed to be the *39 driver had since retired from the fire department and had moved to Topeka, Kansas, making it difficult for the city to produce him. In its charge, the court instructed the jury that the issue of intoxication was entirely out of the case.[1] Exception was duly taken. The jury returned a verdict for the plaintiff on the issue of liability. After the verdict was announced, the court told the jury, "I can only say for the record that the record supports your verdict.” In this bifurcated trial, the jury then proceeded to consider the question of damages. The jury awarded the plaintiff damages in the amount of $1,600,000. The Appellate Division found the verdict to be excessive and ordered a new trial of only the damages issue unless the plaintiff consented to a reduced verdict of $750,000. After the plaintiff so consented, the court granted the city’s motion for leave to appeal.
In my view, the exclusion of all of the city’s evidence on the intoxication issue was a grave error and was so prejudicial to the city as to require reversal. It was plain from the start of the case that the city would predicate its defense on its contention that plaintiff, his judgment impaired by alcohol, rashly elected to slide down a pole when the alarm rang, rather than continue in an orderly fashion to the stairway. Under this theory, the plaintiff’s fall was not caused by a failure to maintain proper lighting around the pole, but by plaintiff’s inability, due to his inebriated condition, to make appropriate mental judgments and to co-ordinate his physical movements. The issue was so critical to the case that the plaintiff, the first witness to testify, went to great lengths in his direct testimony to deny that he had been drinking on duty. Lieutenant Steyert and another fireman present at the firehouse at the time of the accident were closely questioned, by both parties, as to whether any alcohol was imbibed in the hour and a half before the accident. Even a casual reading of the record would reveal the fact that the issue of whether the plaintiff was intoxicated was critical to the issue of liability.
The medical officer’s statement that he detected an odor of *40 alcohol on plaintiffs breath while in the hospital three hours after the accident should not have been excluded. Rather than being "too remote”, the statement was extremely probative. If there was still alcohol remaining on the plaintiffs breath after so much time had elapsed, the obvious and compelling inference is that plaintiffs alcoholic intake must have been quite substantial. If the jury believed the doctor’s testimony, it could validly infer that the plaintiff was in a condition of extreme inebriation at the time of the accident.
The majority contends that the trial court could properly, in an exercise of discretion, exclude the doctor’s testimony because this testimony might have a "prejudicial impact” (at p 36). Notably, the majority offers no citation for this rather dubious proposition. Of course, the doctor’s testimony would be damaging, if- not fatal, to the plaintiffs claim. However, relevant evidence, whatever its potential impact, is never excludable simply because one party’s position might be weakened thereby. (Guilianelle v Brownell, 7 AD2d 691, 692.) All facts that have a rational probative value are admissible into evidence unless " 'some specific rule forbids’ ”. (Ando v Woodberry, 8 NY2d 165, 167.) Whether a particular fact is relevant "is a question of logic, not of law.” (Richardson, Evidence [10th ed], § 146, p 116.) Evidence that plaintiff, the alleged victim of negligence, had a strong odor of liquor on his breath even hours after the accident leads logically to the conclusion that the negligence, if any, was his own.
There is, of course, the testimony of Lieutenant Steyert that he marked the plaintiff fit for duty, did not observe him to be intoxicated, and that no drinking was permitted at the firehouse. The lieutenant’s credibility is subject to question since it would be against his interest to admit that he marked the plaintiff fit for duty when, in fact, he was under the influence of alcohol. Moreover, there is evidence in the record that firemen who file complaints about fellow workers are considered "rats”. Thus, the conflicting testimony of the doctor and the lieutenant created an issue of fact that the jury had to resolve. The majority contends that the doctor’s testimony was required to be weighed against the absence of other probative evidence to support his testimony (at p 36). First, there was other probative evidence—the blood test report—to substantiate the doctor’s testimony. Secondly, and even more fundamentally, the assessment of evidence is a function committed solely to the jury. Even if the doctor’s testimony was the sole *41 evidence in the case of plaintiff’s intoxication, the jury, and not the Judge, should pass upon that testimony. A trial court cannot, in the name of discretion, remove an issue of fact from the jury’s consideration. By excluding the doctor’s testimony, the court invaded the province of the jury and this error, alone, requires a new trial.
The court also improperly excluded the documentary evidence that supported defendant’s claim of intoxication. The court found that the city had not established a chain of custody. The sole missing link in the chain was that of the medical officer’s driver. The medical officer did testify as to the manner in which he drew the sample and a qualified chemist employed by the well-established private laboratory explained the procedure he followed in conducting the analysis.
The test report, if duly authenticated, was admissible as a record prepared in the ordinary course of the laboratory’s business. (CPLR 4518, subd [a]; People v Porter, 46 AD2d 307.) Of course, a proper foundation must be established before the test results are admissible. Thus, care must be taken to trace the custody of the sample in the chance that someone may have tampered with it. (See People v Malone, 14 NY2d 8.) However, even in criminal cases, the rule is not inflexible. In People v Porter (supra), Judge Cooke, then writing for the Third Department, noted that "where the circumstances provide reasonable assurances of identity and unchanged condition and it would be impossible or an unreasonable requirement to produce each physical custodian as a witness, there has been a relaxation of the rule”. (46 AD2d, at p 311; see People v Connelly, 35 NY2d 171, 174-175.) In this case, there is no question that the sample taken by a department medical officer was the same as the sample tested by the chemist. There is also no indication that the sample was tampered with during the period it was in the driver’s custody. Nor does the plaintiff so claim. In my view, the identity of the sample was sufficiently assured to permit the test results to be introduced into evidence. (See People v Turcsik, 43 AD2d 777, app dsmd 34 NY2d 985.) It would be absurd to require that the driver be produced in the absence of any indication or even claim of tampering.
Although not made a predicate of his ruling, the Trial Judge was also concerned that the lapse of time between when the sample was taken and when it was analyzed might affect *42 the reliability of the analysis. However, the undisputed medical testimony was that the lapse of time could only work in the favor of the plaintiff. That is, during the weekend there was the chance that some of the alcohol in the sample may have evaporated, therefore causing a lower reading of alcoholic content. On the other hand, there was no possibility that the lapse of time would increase the percentage of alcohol in the sample of plaintiffs blood. Interestingly, as it was, the analysis revealed the presence of .09% alcohol in plaintiffs blood, a level just below the amount that would legally preclude him from driving an automobile (.10%). (See Motor Vehicle and Traffic Law, § 1192, subd 2.) It is apparent, then, that the court’s arbitrary decision to exclude the substantial evidence of intoxication proffered by the city cut the heart from the city’s defense. The city is entitled to a new trial for that reason alone.
The court also committed two further errors in its charge to the jury. These errors, in addition to the exclusion of the intoxication evidence, illustrate the manner in which the court removed from the jury’s consideration the major issues presented by the city. The court instructed the jury that, because the fire alarm had sounded, plaintiff was confronted with an emergency situation. Thus, the jury was authorized to find, without more, that the plaintiff was not contributorily negligent, but was "guilty merely of an erroneous judgment, rendered hastily in an emergency”. (Raolaslovic v New York Cent. R. R. Co., 245 NY 91, 101.) The mere sounding of a fire alarm does not create an emergency situation in a fire station. The alarm is sounded for the sole purpose of inducing the firemen to act expeditiously. It does not authorize them to act without due caution. All firemen are trained, as was the plaintiff, to act calmly and dispassionately in true emergency situations. Their services would be of little value to the community they serve if, at the first ringing of an alarm, firemen chose to cast their own sense of good judgment to the wind. Such thoughtlessness may not only cause injury to the fireman involved, but harm members of the public who place great reliance in his professional judgment. The plaintiff was not at the scene of or involved in an actual emergency. For this reason I believe that the court erred in instructing the jury that plaintiff was acting in an emergency situation.
*43 As a corollary to its charge on emergencies,[2] the court instructed the jury that, if the plaintiff was acting in an emergency (as the court stated he was), plaintiff was entitled to make use of the sliding pole. The departmental regulation that the court cited for this proposition is, in fact, to the contrary. The regulation provides that sliding poles are not to be used "except in connection with response to alarms.” (Rules and Regulations of the Uniformed Force of the Fire Department of the City of New York, § 19.3.9.) This rule does not mandate that in all cases firemen must use sliding poles to respond to alarms; it merely forbids them from using the sliding poles unnecessarily. A critical issue was, thus, taken from the jury. The plaintiff had actually started for the stairs and had walked as far as the middle of the room before the alarm rang. The jury was told, in effect, that the plaintiff was required to walk all the way across an allegedly darkened room to use a sliding pole, even though he was already en route to the stairs. In my view, this, also, was error. The plaintiff’s offhand statement, relied upon by the majority, as to his own view of the rule, is no substitute for the very terms of the written rule itself. Moreover, even assuming that the plaintiff was required to use the pole, he was, in no event, licensed to run towards it in total darkness, as he admits he did.
In sum, the court, by its evidentiary rulings and its charge, removed the critical factual issues from the jury’s consideration. The court left the jury no choice but to find for the *44 plaintiff, a result that the Judge evidently personally favored. The court usurped the proper function of the jury and conducted the trial in a manner fundamentally unfair to the defendant. In light of the exceedingly close liability question, I believe that a new trial is required. Accordingly, I dissent.

. On the issue of intoxication, the trial court instructed the jury as follows: "I charge you that alcohol or the influence of alcohol is not in this case; as a matter of law I tell you this. There is no evidence for your consideration that is probative, that is valuable in The Court’s opinion for you to make any such deductions. On the contrary even from the defendant’s exhibits * * * and from the testimony of all the other witnesses that said he was not under the influence of alcohol, there clearly is nothing from which you could infer that he was. The medical records, the medical evidence that we have does not support it nor does the testimony.”

. The relevant portions of the court’s charge are hereinafter set forth:
"Now, the evidence without contradiction shows that the plaintiff was required to respond to signal 3762 by sliding the pole in question, that is pole 'A’ or any pole, but by pole. His job was to get to the fire apparatus and respond to the fire alarm by sliding the pole and only by sliding the pole. If that was an emergency he had no choice. He must take a pole because that is an alarm and either whether first due or second due it was an emergency condition ** * *.
"Now, what is the duty of a fireman facing an emergency condition? A person faced with an emergency condition and who acts without opportunity for deliberation may not be charged with negligence if he acts as a reasonably prudent person would act with the same duties and under the same emergency circumstances.
* * *
"If you believe from the evidence that the plaintiff was responding to an alarm and that therefore there was an emergency then in that event the plaintiff had the right to use the sliding pole and more than that was compelled to use the sliding pole under Section 19.3.9 of the Rules and Regulations of the Uniformed Force of the Fire Department of the City of New York because that is the method by which you use in an emergency the pole.”